**OCEAN ADVOCATES,**
**et al., Plaintiffs,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS, et al., Defendants.**

**No. C00–1971L.**

United States District Court,
W.D. Washington,
at Seattle.

Oct. 10, 2001.

John B Arum, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA, Claudia Newman, Bricklin & Gendler, Seattle, WA, for Ocean Advocates, Fuel Safe Washington, North Cascades Audubon Society, Dan Crawford, Re Sources, plaintiffs.

Brian C Kipnis, U S Attorney's Office, Seattle, WA, for U.S. Army Corps of Engineers, James M Rigsby, Colonel, Ralph H Graves, defendants.

Elaine L. Spencer, Stephen H. Goodman, Maureen Denise Burke, Graham & Dunn, Seattle, WA, for Atlantic Richfield Co., intervenor.

## ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

LASNIK, District Judge.

This is a suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, for judicial review of a federal administrative agency action. This matter comes before the Court on three motions for summary judgment filed by Ocean Advocates [1], the United States Army Corps of Engineers (the "Corps") and defendant-intervenor Atlantic Richfield Company ("ARCO"). Ocean Advocates questions the Corps' issuance and extension of a permit allowing ARCO to construct a northern addition to its existing refinery dock on the shores of the Strait of Georgia at Cherry Point, Washington. It seeks declaratory, injunctive and other relief. Specifically, it requests the following declaratory relief: (1) the Corps' decision to issue and extend ARCO's permit violated the Magnuson Amendment to the Marine Mammal Protection Act, 33 U.S.C. § 476; (2) the Corps' decision not to prepare an Environmental Impact Statement ("EIS") violated the National Environmental Policy Act ("NEPA"); and (3) the Corps' decision not to issue a revised public notice and allow public comment prior to the extension of the permit violated 33 C.F.R. § 325.6 and Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403. Ocean Advocates also requests that this Court remand this matter back to the Corps with instructions to prepare an EIS, complete the public notice and comment procedures and include limiting conditions regarding the number of oil tankers in any permit issued to ARCO. Finally, Ocean Advocates seeks injunctive relief and asks the Court to freeze the amount of crude oil tanker traffic and the amount of crude oil handled pending compliance with any remand of this matter that the Court might order.

In addition to opposing Ocean Advocates' motion for summary judgment, the Corps filed a cross-motion for summary judgment, alleging its actions did not violate the Magnuson Amendment, NEPA, or Section 10 of the Rivers and Harbors Act.

Defendant-intervenor ARCO also opposes Ocean Advocates' motion for summary judgment and submits its own cross-motion for summary judgment. In addition to joining in with all of the arguments advanced by the Corps, ARCO argues that Ocean Advocates' claims regarding the Magnuson Amendment must be dismissed because of lack of standing or barred on the basis of laches.

All parties agree that no genuine issue of material fact exists for trial and that the case can be decided on motions for summary judgment. All three motions for summary judgment have been fully briefed. The Court held oral argument on all three motions on September 20, 2001. The Court has carefully reviewed the administrative record ("AR") in this matter. For the reasons stated in this Order, the Court denies Ocean Advocates' motion for summary judgment and its requests for declaratory, injunctive and other relief. The Court grants the Corps' motion for summary judgment and finds the Corps' actions did not violate the Magnuson Amendment or NEPA. The Court grants ARCO's motion for summary judgment on the merits and denies its motion for sum-

---

1. The plaintiff group in this matter is composed of four non-profit organizations (Ocean Advocates, Fuel Safe Washington, North Cascades Audubon Society and RE Sources) and two individuals (Frederick Felleman, Northwest Director of Ocean Advocates, and Dan Crawford, a commercial fisherman).

mary judgment on the issues of standing and laches. The Court finds that Ocean Advocates does not have a private right of action to pursue a claim under Section 10 of the Rivers and Harbors Act, and even it did, would not succeed on the merits.

In Part I of this Order, the Court provides a detailed factual background regarding the permit process for ARCO's dock extension. In Part II, the Court addresses the threshold issue of standing, the defense of laches and the standard of review. In Part III, the Court considers whether the Corps' decision to issue and extend the ARCO permit constitutes a violation of the Magnuson Amendment. In Part IV, the Court analyzes whether the Corps' decision not to prepare an EIS is a violation of NEPA. In Part V, the Court analyzes Ocean Advocates' claim under Section 10 of the Rivers and Harbors Act. In Part VI, the Court addresses the various forms of relief sought by the parties.

## I. FACTUAL BACKGROUND

Cherry Point is a "heavy impact industrial" zoning area and currently has three major industrial facilities: the ARCO refinery, the ALCOA Intalco aluminum plant and the Tosco refinery. AR 1052, 1569. In addition, there is a proposal to build a bulk commodities pier, the Gateway Pacific Terminal, one mile south of the ARCO refinery. See AR 1283, 1297, 1494.

On January 20, 1969, the Corps issued the initial permit to ARCO. In 1971, ARCO constructed its refinery at Cherry Point, Washington in order to refine Alaskan North Slope crude oil. See AR 1086. At that point, ARCO decided to build only the southern half of the dock. See AR 1090. Construction of the northern dock was postponed until the southern dock reached capacity or until the loading and unloading hampered refinery operations. See id. The ARCO pier is an L-shaped structure that is about 227 feet long by 65 feet wide, accessible from the shore by a 1,800 foot trestle. See AR 1093. The southern dock was constructed to off-load crude oil, has a maximum receiving capability of 1,200,000 barrels per day and has a current refinery rate of 230,000 barrels per day.

On May 5, 1992, ARCO submitted an application for a permit to construct the northern half of the dock at issue in this lawsuit. See AR 164–65. The dock extension would double the berthing capacity of the dock by adding a new wing extending about 950 feet to the west of the existing pier. See AR 1576–77. The Corps gave public notice of ARCO's application on June 3, 1992. See AR 122–33. The Corps received substantive remarks from the U.S. Fish and Wildlife Service ("FWS"), the Lummi Indian Nation and the Nooksack Indian Tribe. FWS expressed a concern about the cumulative impact of this project along with other proposed industrial projects in the area with regard to an increased risk of an oil spill. It was also concerned about the project's impact on benthic vegetation. See AR 110–12.

ARCO responded to FWS' concerns by explaining that the dock extension would reduce the risk of an oil spill because oil tankers would not be waiting in the Cherry Point area for a long period of time before they were offloaded. ARCO also explained that the dock extension would have no effect on benthic vegetation. The shading from the dock would not impact benthic vegetation because such plant life does not rely on sunlight for its existence. See AR 64–66. The Lummi Indian Nation and the Nooksack Indian Tribe initially expressed concern regarding their federal fishing rights. ARCO entered into mitigation agreements with both tribes and the tribes withdrew their objections to the dock extension. See AR 53–55, 384–85.

In the meantime, the marbled murrelet was added to the list of threatened species

under the Endangered Species Act ("ESA"). The Corps asked ARCO to submit information on whether its project would affect these birds. On November 3, 1993 and again on June 15, 1995, ARCO submitted reports regarding the effect of the dock extension on marbled murrelets and other marine birds in the area. *See* AR 21–35, 956–87. After confirming that there would be no impact on the marbled murrelets, the Corps also sought and received confirmation from ARCO that eelgrass beds (habitat for spawning herring and juvenile salmon) would not be affected.

On March 1, 1996, the Corps issued ARCO a permit under Section 10 of the Rivers and Harbors Act, allowing it to construct the new wing to serve as a "petroleum product loading/unloading facility." *See* AR 344. The construction was to be completed in five years, by March 1, 2001. The Corps also issued a Finding Of No Significant Impact ("FONSI") and an Environmental Assessment ("EA").

In October 1997, Ocean Advocates wrote to the Corps, expressing concerns as to whether the 1996 permit issued to ARCO violated the Magnuson Amendment. *See* AR 318. Ocean Advocates requested that the Corps reopen the permit review for an analysis of cumulative impacts. The Corps denied the request and erroneously stated that the refinery was at capacity and that the construction of the dock extension would therefore not result in an increase of the volume of crude oil handled at the facility. *See* AR 316. On September 29, 1999, Ocean Advocates' counsel wrote to the Corps, asking for reconsideration of the 1996 permit. *See* AR 292–95. Ocean Advocates stated the refinery was not at

capacity (as the Corps erroneously concluded), that the cumulative impact of increased vessel traffic should be examined, and the Magnuson Amendment issue should be revisited. *See* AR 293–95. The Corps requested more information from Ocean Advocates regarding ARCO's refinery capacity and a copy of the July 1999 Screening Level Ecological Risk Assessment ("SLERA") issued by the Washington Department of Natural Resources ("DNR").[2] *See* AR 241. On November 11, 1999, Ocean Advocates supplied the Corps with information on ARCO's refinery. *See* AR 241–51. On March 9 and 20, 2000, ARCO submitted letters to the Corps to respond to Ocean Advocates' comments regarding the Magnuson Amendment. *See* AR 218, 1508.

Around March 2000, ARCO requested a one-year extension of 1996 permit in order to complete construction of the dock extension. The Corps consulted with the FWS and the National Marine Fisheries Service because a number of salmonid species had been listed as threatened under the ESA. ARCO provided the Corps with a Biological Evaluation ("BE"), dated March 31, 2000, which evaluated the potential impact of the dock extension on Chinook and Coho salmon, Stellar sea lions, humpback whales, leatherback sea turtles, bald eagles and marbled murrelets. *See* AR 1461–1500. It updated the BE in April and May 2000. The BE concluded that there would be no effect on the Stellar sea lion, leatherback sea turtle, bald eagle and marbled murrelet. It found that the Chinook salmon, Coho salmon and bull trout were in the "may affect, not likely to adversely affect"

2. In 1998, ARCO had to halt work because of issues that arose regarding tidelands and beds of navigable water it had to lease from the DNR in order to construct the dock extension. DNR conditioned the lease on the results of the SLERA, the purpose of which was to assess the impact of the project on Pacific

herring. Herring are a food source for the endangered Chinook salmon. The SLERA concluded that the impact of the dock extension on the herring would be no greater than negligible to low. *See* AR 1548. Based on the SLERA results, DNR executed the lease with ARCO.

category. On June 13, 2000, FWS agreed with the findings of the BE that the project "may affect, not likely to adversely affect" the bull trout. *See* AR 1316. The National Marine Fisheries Service agreed with the BE's finding that project may affect but was not likely to adversely affect the listed salmonids. *See* AR 1314–15. On May 2, 2000, Ocean Advocates requested that the Corps issue a public notice for ARCO's permit extension. The Corps denied this request. *See* AR 1375.

In the meantime, the Corps requested more information from ARCO regarding compliance with the Magnuson Amendment, and ARCO responded with a letter on May 30, 2000 and then with another letter regarding cumulative impacts on June 22, 2000. On June 29, 2000, the Corps approved ARCO's request for a permit extension, issued an amended EA, and an amended FONSI. The Corps concluded that the dock extension would not violate the Magnuson Amendment and that the ESA consultation regarding threatened and endangered species was completed. It conceded that its earlier statement that the refinery was at maximum capacity was incorrect, but noted that the erroneous statement was not crucial to the decision. Ocean Advocates received notice of ARCO's permit extension on June 29, 2000 and filed this lawsuit on November 21, 2000.

## II. STANDING, LACHES AND STANDARD OF REVIEW

### A. *Standing*

■ ARCO argues that Ocean Advocates lacks standing to pursue its claims regarding a violation of the Magnuson Amendment. Standing presents both constitutional and prudential requirements that a plaintiff must satisfy in order to invoke federal jurisdiction. To satisfy the Article III case or controversy requirement, a plaintiff must demonstrate he has

suffered an injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision. *See Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). In environmental cases, a plaintiff may assert an injury in fact by demonstrating a connection to an area of concern and asserting that his life will be less enjoyable if that area is altered. *See Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir.2000). An environmental plaintiff may also demonstrate an injury in fact by showing "an increased risk of harm" where the harm is tied to an alleged statutory violation. *Id.* at 1151.

■ To establish prudential standing under the APA, a plaintiff must demonstrate that he is "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. He must demonstrate that his grievance falls within the "zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett*, 520 U.S. at 162, 117 S.Ct. 1154. The zone of interests test is not intended to be a difficult standard. *See Oregon Natural Resources Council v. United States Forest Service*, 59 F.Supp.2d 1085, 1089–90 (W.D.Wa.1999).

Some of the individual members of the plaintiff organizations assert that they are injured in fact because their aesthetic pleasure or use of the area will be harmed by the extension of the ARCO dock. Their assertions are based on the presumption that the dock extension will increase tanker traffic. Plaintiff Dan Crawford, a commercial fisherman, asserts that increased tanker traffic will directly impact his ability to catch crab and salmon in Rosario Straits, Bellingham Bay and Cherry Point, near the ARCO dock. *See* Decl. of Elaine Spencer, Exh. E (Crawford Depo. at 82–

85). Each time a tanker comes through, Crawford is obligated to quit fishing because the tankers have right of way. *See id.* Brad and Marie Johnson, members of plaintiff organization Fuel Safe Washington, own property south of Cherry Point and assert that increased tanker traffic will increase erosion to their beachfront property and take away from their aesthetic enjoyment of the sea life at Cherry Point. *See* Decl. of Linda Marie Johnson at 2–3.

■ ARCO asserts that Crawford's concern that his fishing will be impacted by vessel traffic is not unique to oil tanker traffic because Crawford must pull in his nets whenever a vessel with the right of way approaches him in Rosario Strait. *See* 33 C.F.R. § 165.1301(c)(4), (d)(1). ARCO similarly argues that Fuel Safe Washington's concerns regarding erosion and aesthetic enjoyment are problems that arise from all vessel traffic, not just oil tankers. While ARCO's point that all large vessels will detrimentally affect commercial fishing and beach property is duly noted, ARCO's oil tankers are in part responsible for the loss of use and enjoyment of the area. The plaintiffs have established injury in fact based upon harm to their professional, aesthetic and recreational use of the area.[3] The injury plaintiffs allege is fairly traceable back to ARCO for it is the extension of the dock that plaintiffs believe will add to increased tanker traffic. If the Court were to grant plaintiffs their requested relief, declaratory, injunctive or otherwise, their concerns would be redressable. Accordingly, plaintiffs have satisfied the constitutional requirements for standing.

Next, the Court addresses whether plaintiffs satisfy the prudential "zone of interests" requirement with regard to their alleged Magnuson Amendment violation. The Magnuson Amendment is discussed in substantial detail in Part III, but is briefly addressed here. The Magnuson Amendment states "it is necessary to restrict such tanker traffic in Puget Sound" in order to protect the waters and the shore area from environmental harm. 33 U.S.C. § 476. Plaintiff Crawford expresses an interest in the waters and members of plaintiff organization Fuel Safe Washington express an interest in protecting the waters and the shore from environmental harm. The zone of interests test is not intended to be demanding. The plaintiffs have demonstrated that they are within the zone of interests to bring a claim regarding the Magnuson Amendment. Accordingly, plaintiffs have satisfied both the constitutional and prudential requirements of standing and are able to have their claims heard by this Court.

### B. *Laches*

■ The Court addresses ARCO's defense of laches and its contention that all of Ocean Advocates' claims must be dismissed on such a basis. In order to apply laches, a defendant must establish a lack of diligence by the plaintiff and prejudice to the defendant resulting from the plaintiff's lack of diligence. *See Neighbors of Cuddy Mountain v. United States Forest Service,* 137 F.3d 1372, 1381 (9th Cir.1998). Laches is not a defense that is favored and should be "invoked sparingly" in environmental cases brought to vindicate the public interest. *Id.* To determine if a party is diligent, a Court may consider whether the party has made its position known prior to filing suit, the agency's response to the party's request and developments such as

---

**3.** Because the Court has determined that an injury in fact exists based on direct harm to the plaintiffs' professional, aesthetic and recreational use of the property, the Court need not address their assertion of an injury based on the belief of an increased risk of an oil spill.

preparatory construction that motivate citizens to investigate and challenge agency actions. *See Coalition for Canyon Preservation v. Bowers,* 632 F.2d 774, 779 (9th Cir.1980).

The Ninth Circuit is liberal in its interpretation of diligence. For example, in *Coalition for Canyon Preservation,* the court reversed a district court's ruling that waiting ten years to file a lawsuit after a highway project was proposed was barred by laches. The Ninth Circuit noted that it took six years to approve the final designs for the highway project and it took eight years for the project to get the actual approval to proceed. Plaintiffs filed their lawsuit six weeks after construction began. The court found that plaintiffs were not charged with delaying their suit for ten years, did not lack diligence, and were not barred by the doctrine of laches.

In the key and perhaps only case in which the Ninth Circuit has barred an environmental plaintiff's suit by imposing laches, the plaintiff tribe received notice of the agency's plan, failed to respond to the agency's request for comments and to the final EIS, and actually requested to be taken off of the agency's mailing list. *See Apache Survival Coalition v. United States,* 21 F.3d 895, 907–09 (9th Cir.1994). The Ninth Circuit found the tribe's delayed protest, after it failed to respond to the agency's constant requests for comments and for a meeting, to be barred by laches.

■ Here, ARCO's initial application for the dock extension was made public in 1992 and the permit was issued in 1996. ARCO was given the one-year permit extension by the Corps on June 29, 2000.

Plaintiff Fred Felleman appears to be the first plaintiff with knowledge of the ARCO project, sometime in 1996. Felleman voiced concerns to the Corps about the ARCO project from 1996 to 1999. *See supra,* Part I. Plaintiffs made their concerns known to the Corps before filing suit. *See* AR 215, 226, 241, 282, 318. Plaintiffs allege that they were unaware of any construction by ARCO until June 29, 2000 because all of the prior construction had been underwater. They filed this lawsuit on November 21, 2000. The plaintiffs in this case demonstrate that they made the Corps aware of their concerns prior to filing this suit, that the Corps did not respond to their satisfaction, and that ground construction motivated them to investigate and pursue this action. Plaintiffs did not act like the plaintiff in *Apache Survival,* attempting to stop the process after showing a complete disinterest in the project. Rather, Ocean Advocates' behavior resembled that of the plaintiffs in *Coalition for Canyon Preservation,* filing suit shortly after they were aware of construction efforts. Laches should be invoked sparingly in environmental cases. They should not be applied here because there was no lack of diligence on the part of the plaintiffs. Because ARCO is unable to establish a lack of diligence, there is no need to address undue prejudice. This action is not barred by the defense of laches.[4]

## C. *Standard of Review*

■ Under the APA, 5 U.S.C. § 706, this Court is required to set aside the Corps' actions if they were "arbitrary and capricious, an abuse of discretion, or other-

---

4. While this action is not barred by laches, the Court recognizes the extreme harm and prejudice that ARCO would face if restrictions were imposed upon ARCO at this point. ARCO has already expended $30 million of the $31 million necessary to build the dock extension. All of the in-water construction is complete. ARCO reasonably asserts that it would not have built the dock if it knew that restrictions and conditions would be imposed on the dock extension or the refinery.

wise contrary to law." This Court's administrative review is limited to the administrative record that was in existence at the time of the decision. *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir.2000). An agency has the discretion to rely upon the reasonable opinions of its own experts, even if the court might find contrary views to be more persuasive. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

In reviewing an agency's interpretation of a statute, such as the Magnuson Amendment in this case, the Supreme Court's holding in *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is instructive:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

 The Corps is the permit-issuing agency that administers the Magnuson Amendment. Ocean Advocates' assertion that the Department of Transportation is responsible for carrying out the Magnuson Amendment is incorrect. Because the Corps administers the Magnuson Amendment, the Corps' interpretation of the statute is given deference and the applicable standard of review is that articulated in *Chevron.*

## III. MAGNUSON AMENDMENT

The complete text of Magnuson Amendment follows:

> 33 U.S.C. § 476. Restrictions on tanker traffic in Puget Sound and adjacent waters.
>
> (a) The Congress finds that—
>
> (1) the navigable waters of Puget Sound in the State of Washington, and the natural resources therein, are a fragile and important national asset;
>
> (2) Puget Sound and the shore area immediately adjacent thereto is threatened by increased domestic and international traffic of tankers carry crude oil in bulk which increases the possibility of vessel collisions and oil spills; and
>
> (3) it is necessary to restrict such tanker traffic in Puget Sound in order to protect the navigable waters thereof, the natural resources therein, and the shore area immediately adjacent thereto, from environmental harm.
>
> (b) Notwithstanding any other provision of law, on and after October 18, 1977, no officer, employee, or other official of the Federal Government shall, or shall have authority to, issue, renew, grant, or otherwise approve any permit, license, or other authority for constructing, renovating, modifying, or otherwise altering a terminal dock, or other facility in, on, or immediately adjacent to, or affecting the navigable waters of Puget Sound, or any other navigable waters in the State of Washington east of Port Angeles, which will or may result in any increase in the volume of crude oil capable of being handled at any such facility (measured as of October 18,

1977), other than oil to be refined for consumption in the State of Washington.

The issue is whether the Corps' issuance of the 1996 permit and the 2001 permit extension violated the Magnuson Amendment, specifically the provision prohibiting the issuance of a permit that allows for the construction or alteration of a dock "which will or may result in any increase in the volume of crude oil capable of being handled at any such facility."

The Corps found that ARCO's dock ·extension would not violate the Magnuson Amendment because "it does not appear that the pier extension may or will cause an increase in tanker traffic or an increase in crude oil offloaded at the existing pier." *See* AR 1282. To support this decision, the Corps turns to the language of the permit itself, which allows for a "petroleum product loading/unloading facility." "[P]etroleum product" does not apply to crude oil because the very definition of crude oil is that it is oil to be refined. Petroleum product must necessarily exclude crude oil, which is not a "product" at all. Because the permit applies only to petroleum product, it has no effect on the volume of crude oil.

Second, the Corps points out that the Magnuson Amendment refers to increasing the "volume of crude oil *capable* of being handled." 33 U.S.C. § 476(b) (emphasis added). The statute does not prohibit an increase in the volume of crude oil *actually* being handled. It prohibits an increase in the capacity. The dock is capable of unloading crude oil at a rate of 1,200,000 barrels per day and it has a

current refinery rate of 230,000 barrels per day. The dock extension, even if it were to increase the volume of the crude oil handled, would not change the capability of the facility because the facility is not at maximum capacity.

Ocean Advocates argues that the dock extension, which increases berthing capacity from one ship to two ships at a time, will result in an increase of the volume of crude oil that the dock facility is capable of handling. It believes that the dock extension will result in an increased number of tankers, which will result in an increase of the amount of crude oil handled at the dock. It argues that the Corps' issuance of a permit is contrary to Congress' intent to "restrict such tanker traffic in Puget Sound." 33 U.S.C. § 476(a)(3). It asserts that the title of the Magnuson Amendment refers to "tanker traffic" and that its purpose is to prevent any construction or modification that would increase crude oil tanker traffic.

Ocean Advocates cannot meet its burden of establishing that the Corps' interpretation is not a permissible construction of the statute. There is nothing in the record that supports the theory that the dock extension for petroleum product would increase the crude oil handling capability. The dock extension is not equipped or designed to handle crude oil. *See* AR 1332–35. In fact, ARCO states in its reply brief that it is willing to stipulate to the entry of an injunction that its dock extension shall not be utilized to offload crude oil. *See* ARCO's Reply in Support of Cross Motion for Summary Judgment on the Merits at n. 1.[5]

---

**5.** ARCO has voluntarily offered to stipulate to the "entry of an injunction precluding use of the dock to off-load crude" and has asserted that the sole purpose of the extension is for loading and unloading petroleum product. *See* ARCO Reply in Support of its Cross–MSJ on the Merits at n. 1. The Court accepts ARCO's invitation to enter into such a stipu-

lated injunction. An injunction is a remedy that is capable of enforcement and a more meaningful solution than a statement of present intention not to use the new dock extension for crude oil. Accordingly, ARCO is directed to submit a stipulated injunction to this effect for Court approval within 10 days from the date of this Order.

Ocean Advocates' request for an insertion into the permit of a provision regulating the operation of the dock is denied. This request exceeds the authority granted to the Corps by the Magnuson Amendment.

■ The Court finds that the Corps has given effect to the clear intent of Congress. The Magnuson Amendment seeks to limit the volume of crude oil, not the volume of refined oil. If Congress had intended to limit refined oil, it would have inserted such language. The permit issued to ARCO authorized a dock extension for loading and unloading petroleum product, not crude oil. Moreover, the Magnuson Amendment prohibits an increase in the volume of crude oil *capable* of being handled as of October 18, 1977. Because the dock is not at maximum capacity, a modification that might increase oil tanker traffic to the point of maximum capacity is not violative of the Magnuson Amendment. Finally, the Court is convinced that if Congress had intended to limit the number of tankers rather than the volume of crude oil capable of being handled at the dock, it would have phrased the statute in such a manner. Ocean Advocates' assertions that the Corps' decisions to issue ARCO the 1996 and 2001 permits were arbitrary and capricious or contrary to the law are rejected. The Corps' interpretation of the Magnuson Amendment is a clear application of Congress' intent and is upheld.

## IV. NEPA AND NEED TO PREPARE AN EIS

NEPA requires an agency to take a "hard look" at the environmental consequences of its actions. *Metcalf v. Daley,* 214 F.3d 1135, 1141 (9th Cir.2000). It also requires agencies to prepare an EIS for all major federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). An agency may first prepare an EA to determine whether there is a significant environmental impact that will warrant the preparation of an EIS. *See* 40 C.F.R. § 1508.9. If the agency determines the environmental impact is insignificant, it will issue a FONSI. ·*See id.*

There are certain factors that an agency must balance in determining whether a project will have a "significant" impact, including: (1) unique characteristics for the geographic area; (2) whether the action is related to other actions with individually insignificant but cumulatively significant impacts; (3) the degree to which the possible effects on the human environment are likely to be highly controversial; (4) the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; (5) the degree to which the action may adversely affect an endangered or threatened species; and (6) whether the action threatens to violate a federal, state or local law that protects the environment. *See* 40 C.F.R. § 1508.27.(b)(3). The Court's role is to ensure the Corps fulfilled its responsibility in considering context and intensity. The Corps issued the 1996 FONSI and an amended FONSI in 2000. Ocean Advocates asserts the Corps failed to take a hard look at the impact of the ARCO dock extension before it issued the 1996 permit and the 1996 FONSI, and again when it issued the permit extension and an amended FONSI. The Court reviews those assertions below.

### A. *Unique Characteristics*

Ocean Advocates alleges that the Corps failed to take into account the unique characteristics of Cherry Point, namely that it provides a spawning ground for Pacific herring and is home to sea birds that are critical to the threatened Chinook salmon.

■ Ocean Advocates is incorrect. The Corps found the pile driving construction for the dock extension would not have

an adverse effect on the herring or the juvenile salmonids because all construction work would occur in water deeper than 30 feet. *See* AR 358. It also determined that benthic vegetation and eelgrass beds would not be affected by the project. *See* AR 359. It found there would be no adverse impact on any of the listed species under the ESA, including bald eagles, peregrine falcons and marbled murrelets. *See* AR 362–63. The Lummi Indian Nation and Nooksack Tribe withdrew objections regarding their fishing rights. In all, the Corps took into account the unique characteristics of the area and determined the impact of the project would be negligible to none. *See Presidio Golf Club v. National Park Service,* 155 F.3d 1153, 1162 (9th Cir.1998) (finding that the Park Service took the unique characteristics of the geographic area into consideration and that the EA was "replete with considerations of the unique characteristics of the Presidio").[6] The Cherry Point shoreline and the adjacent subtidal zone are one of "the best studied areas in the north Puget Sound region" and as such, much information was available to the Corps in its study of the unique characteristics of the area. AR 1110. Ocean Advocates is unable to establish that the Corps' finding of no significant impact to the unique characteristics is arbitrary and capricious.

**B. *Cumulative Impact***

Next, Ocean Advocates argues that the Corps was required to prepare an EIS because several actions may have a cumulatively significant environmental effect. Cumulative impact takes into account "past, present and reasonably foreseeable future actions" over a period of time. *See* 40 C.F.R. § 1508.7.

Ocean Advocates presents two main arguments. First, it argues that the ARCO dock extension may contribute to a cumulatively significant increase in vessel traffic which in turn could have a significant environmental impact. It does not present any evidence that vessel traffic will increase. Rather, it presumes that the availability of dock space will inevitably create more vessel traffic. Second, it argues that the Gateway project has been pending before the Corps and that the cumulative impact of the ARCO pier extension and the Gateway project may be significant.

The first argument regarding a possible increase in vessel traffic is hypothetical. Evaluation of such an assertion is within the discretion of the Corps. *See Headwaters, Inc. v. Bureau of Land Management,* 914 F.2d 1174, 1181–82 (9th Cir.1990) (agency not required to consider infeasible alternatives or those remote from reality). The Corps accepted ARCO's argument that the purpose of the dock extension was to deal with existing tanker traffic, not to address increased tanker traffic.

The FAA made the same argument in *Seattle Community Council Federation v. FAA,* 961 F.2d 829 (9th Cir.1992), as the Corps makes here. There, the FAA had a plan to change flight patterns to deal with existing air traffic. The FAA's plan was not intended to increase the volume of the air traffic directly, but the plan would increase efficiency of the air traffic system and allow for the volume of flights to increase. *See id.* at 836. The court found the intent of the plan, to deal with existing air traffic, was what mattered. Accordingly, the court held that there was no need

---

**6.** *But see National Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722 (9th Cir.2001) (finding that Park Service's lack of knowledge and generic statement that effects are unknown did not constitute "hard look" mandated by

NEPA if EIS is to be avoided). *National Parks* is not applicable to the instant case because the Corps obtained the necessary knowledge to determine that an EIS was not necessary.

to remand the matter to the agency to further study the effects of increased flight traffic. *See also Morongo Band of Mission Indians v. FAA,* 161 F.3d 569, 580 (9th Cir.1998) (holding that increased efficiency and reduction in delays that would result from the airport enhancement project would necessarily allow the volume of airport traffic to increase, but the plan was intended to deal with existing traffic, and a foreseeable indirect effect of the airport enhancement project was not considered a growth-inducing impact under 40 C.F.R. § 1508.8(b) requiring further study).

■ The same reasoning applies here. The increased efficiency at the ARCO dock may lend itself to increased traffic, but the purpose of the dock extension is to deal with existing traffic. Accordingly, there is no need to remand this matter to the Corps for further study of increased vessel traffic.

■ Next, Ocean Advocates argues that the Corps was required to prepare an EIS to study the cumulative impact of the ARCO dock extension and the Gateway project. The Corps initially defended its decision not to prepare an EIS on the basis that the Gateway project was not reasonably foreseeable, but admitted at oral argument that this was a weak basis for its decision. The Corps also, however, argued that there would be no cumulative impact because the Gateway project may affect vessel traffic, but the ARCO dock extension would not. The administrative record supports the Corps' finding that there is no "cumulative impact" that needs to be studied because the impact would be the sole result of the Gateway project:

> When considering potential and likely future developments, it appears likely that another marine terminal will be constructed to the south of ARCO and Cherry Point by Gateway Pacific for the purpose of transshipping bulk commodities. The addition of this facility would

probably significantly increase vessel traffic in the Southeast Strait of Georgia from an average of two large commercial vessel movement[s] per day to three movement[s] per day.

> *Studies by ENSR (1992, 1995, 1997) and EVS (1999 SLERA) showed that the ARCO pier addition is unlikely to have significant direct, indirect or cumulative effects within the project action areas.* This pier addition will not result in a long-term increase in cumulative effects or significant changes to baseline conditions since it will not significantly increase vessel traffic within the Southeast Strait of Georgia nor will it increase the number of industrial facilities on the Cherry Point shoreline. However, the addition of the Gateway Pacific facility with that of the ARCO pier addition may result in long-term cumulative effects because of the significant increase in vessel traffic.

AR 1494 (emphasis added). The record demonstrates that the increased traffic would be a result of the Gateway project. The Corps accepted ARCO's assessment that there would not be any cumulatively significant impact on traffic from the dock extension. The Corps also points out that DNR created the Cherry Point Aquatic Reserve, which effectively prevents any additional leases in the Cherry Point area with grandfathered exceptions for ARCO's dock extension and the Gateway project. *See* AR 1283. This prohibition on further development of the Cherry Point area contributed to the Corps' decision that there would not be a cumulative impact on the area. The Corps' decision that there would not be a cumulative impact was not arbitrary and capricious and is upheld.

## C. *Public Controversy*

Ocean Advocates asserts that the Corps was required to prepare an EIS because the ARCO project was highly controver-

sial. Ocean Advocates insists that the concerns expressed by FWS, the Lummi and Nooksack tribes, and others made this a highly controversial project requiring an EIS.

■■■■ The test is not how many groups express concern about a project but rather if the effect on the quality of the human environment is likely to be highly controversial. The Lummi and Nooksack tribes were at first concerned about their federal fishing rights, but subsequently withdrew their objections after reaching separate agreements with ARCO. FWS was consulted by the Corps and communicated its concerns about the project. The comments received from the tribes and FWS do not elevate this project to the level of "highly controversial." The existence of opposition from Ocean Advocates or concern expressed by the DNR also does not make this project highly controversial. *See Northwest Environmental Defense Center v. Bonneville Power Admin.*, 117 F.3d 1520, 1536 (9th Cir.1997). The Corps was required to consider the information it received and make a reasoned decision, and it did so. Its decision that a public controversy did not exist is upheld.

### D. *Uncertainty*

Plaintiffs argue that the substantial uncertainty regarding increased vessel traffic and the increased risk of an oil spill warranted the preparation of an EIS.[7] A catastrophic oil spill in the navigable waters of Puget Sound is a feared nightmare of every resident of Western Washington. This case raises the specter of just such a catastrophe. Plaintiffs argue that keeping the status quo is the best way to avoid that calamity. The Corps decided that approving ARCO's permit application would mini-

mize tanker stand-by time and decrease the chance of an oil spill.

The Corps argues that the effect of ARCO's project is quite predictable and does not require the preparation of an EIS. ARCO informed the Corps that it expected the number of vessels coming to the dock to increase over time, but that the increase would happen with or without the dock extension. *See* AR 1323–26. ARCO provided a projection of vessel traffic to 2004, which demonstrates that market forces will control the flow of vessel traffic. *See* AR 1326. ARCO convincingly argued that it has proven its ability to accommodate increased market demands with or without the dock extension. In fact, vessel traffic to the dock increased by 30% over eight years without the new dock. *See* AR 1080, 1091. This establishes that the increased vessel traffic is driven by market forces, not the extension of the dock. The Corps accepted this argument. The SLERA also concluded that an increase in vessel traffic would occur under normal conditions, regardless of the dock extension. *See* AR 1820–21.

■■■ The Corps reviewed the information and concluded that vessel traffic would increase regardless of the ARCO project. The Corps has the discretion to weigh the information it receives as it sees fit. The Corps is not required to speculate farther as to increased vessel traffic and the risk of an oil spill. In fact, the Corps has reason to believe that the dock extension will reduce the likelihood of an oil spill by reducing the amount of time an oil tanker must wait to offload. ARCO's argument that the dock extension would free space for tankers to dock and offload, reduce the waiting time of tankers, and thereby reduce the risk of an oil spill, is compelling. The Corps' conclusion that the dock extension would actually reduce

---

**7.** Ocean Advocates repeats its argument regarding the fate of the Pacific herring and the

marine environment, which this Court already addressed in Part IV(A).

the risk of an oil spill is a reasonable finding. Its finding that the effects on the human environment were not highly uncertain is upheld and is not arbitrary and capricious.

### E. *Threatened and Endangered Species*

As already discussed in Part IV(A) of this Order, the Corps performed a detailed analysis of all threatened or endangered species in the Cherry Point area. It was advised by FWS and the National Marine Fisheries Service that the endangered or threatened species listed by the ESA would not likely be adversely affected by the ARCO project. As for the Pacific herring, it is not listed as threatened or endangered. The negligible to low impact of this project upon the threatened and endangered species does not require the preparation of an EIS.

### F. *Violation of Environmental Laws*

Finally, Ocean Advocates asserts that the purported Magnuson Amendment violation required a full NEPA review. As set forth in Part III of this Order, the ARCO dock extension did not violate the Magnuson Amendment and the Corps' action therefore did not violate NEPA.

This Court has carefully reviewed the decisions of the Corps and has considered whether the Corps took the requisite "hard look" under NEPA before it issued the 1996 permit, the 1996 FONSI, and the amended FONSI, and determined that an EIS was not required. The Court has reviewed the Corps' finding regarding the "context and intensity" of the impacts on the environment. *National Parks and Conservation Ass'n v. Babbitt,* 241 F.3d

722, 731 (9th Cir.2001). The Court finds that the Corps did not clearly err in finding that the unique characteristics were not affected and the dock extension did not significantly contribute to any cumulative impact. The Corps' conclusions that there was neither a high degree of uncertainty nor substantial controversy were not arbitrary and capricious. Finally, the Corps took into account the opinions of experts regarding the impact on threatened and endangered species, as well as the impact on environmental laws. The Corps' actions comply with NEPA.

## V. RIVERS AND HARBORS ACT

Under Section 10 of the Rivers and Harbors Act, the Corps may grant extensions of permits unless it determines the extension would be contrary to public interest. *See* 33 C.F.R. § 325.6(d). Requests for extensions are processed in the same manner as initial permits unless the district engineer determines that "there have been no significant changes in attendant circumstances." *See id.*

The Supreme Court has found that no private right of action can be implied from the language of Section 10 of the Rivers and Harbors Act. *See California v. Sierra Club,* 451 U.S. 287, 291, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). It found that the Rivers and Harbors Act was intended to benefit the public at large through a general regulatory scheme, but found no evidence that Congress anticipated there would be a private remedy. *See id.* Accordingly, it is unnecessary to consider a claim regarding Section 10 of the Rivers and Harbors Act that Ocean Advocates does not have the right to raise.[8]

---

**8.** Even if Ocean Advocates were able to establish a private right of action under Section 10 of the Rivers and Harbors Act, which it cannot do, it would still not succeed on the merits. Here, the district engineer issued a finding that there were no significant changes

to the attendant circumstances since the issuance of the permit. He found that the modifications described in the permit extension application were minor and did not alter the overall design of the project. The record demonstrates that the Corps considered the

## VI. CONCLUSION

For the foregoing reasons, Ocean Advocates' motion for summary judgment and its request for injunctive, declaratory and all other relief are DENIED. The Corps' motion for summary judgment that its actions did not violate the Magnuson Amendment or NEPA is GRANTED. The Court's review of the record reveals that the Corps considered all of the information before it and made reasoned decisions that: (1) the Magnuson Amendment would not be violated by the issuance of the permit or the permit extension; and (2) an EIS was not required under NEPA because the Corps found no significant impacts and issued both a reasoned FONSI and an amended FONSI. The Court found that Ocean Advocates did not have a private right of action under Section 10 of the Rivers and Harbors Act or 33 C.F.R. § 325.6, but even if it did, would not succeed on the merits of that claim. ARCO's motion for summary judgment that the Court dismiss plaintiffs' complaint on the basis of standing or laches is DENIED. ARCO's motion for summary judgment that the Corps' actions in granting the permit and the permit extension were in accordance with the Magnuson Amendment and NEPA is GRANTED. Plaintiffs' complaint is dismissed. The Clerk of the Court is directed to send copies of this Order to all counsel of record and to enter judgment in favor of the defendants and against plaintiffs.

alleged changes in circumstances, including the issue of whether the refinery was operating at full capacity, the decline in the herring stock in Cherry Point, and the listing of the Chinook salmon and the bull trout on the ESA. *See* AR at 1280–84, 1399–1400. The Corps found that these purported changes

were not significant and did not warrant public comment and notice. The Court defers to the expertise of the Corps and finds that its decision not to open the permit extension application to public notice and comment was a reasoned one and not arbitrary and capricious.