**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OCEAN ADVOCATES, a non-profit
organization; FUEL SAFE
WASHINGTON, a non-profit
organization; NORTH CASCADES
AUDUBON SOCIETY, a non-profit
organization; DAN CRAWFORD, an
individual; RE SOURCES, a non-
profit organization,
               *Plaintiffs-Appellants,*

         v.

UNITED STATES ARMY CORPS OF
ENGINEERS; RALPH H. GRAVES,
               *Defendants-Appellees,*

BP WEST COAST PRODUCTS, LLC,
f/k/a Atlantic Richfield Company,
               *Intervenor-Appellee.*

No. 01-36133

D.C. No.
CV-00-01971-RSL

OCEAN ADVOCATES, a non-profit
organization; FUEL SAFE
WASHINGTON, a non-profit
organization; NORTH CASCADES
AUDUBON SOCIETY, a non-profit
organization; DAN CRAWFORD, an
individual; RE SOURCES, a non-
profit organization,
            *Plaintiffs-Appellees,*

            v.

UNITED STATES ARMY CORPS OF
ENGINEERS; RALPH H. GRAVES,
            *Defendants-Appellants,*

BP WEST COAST PRODUCTS, LLC,
f/k/a Atlantic Richfield Company,
            *Intervenor-Appellant.*

No. 01-36144

D.C. No.
CV-00-01971-RSL

ORDER
AMENDING
OPINION AND
DENYING
PETITIONS FOR
REHEARING/
REHEARING EN
BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
April 11, 2003—Seattle, Washington

Filed March 15, 2004
Amended March 4, 2005

Before: Dorothy W. Nelson, Sidney R. Thomas,
Circuit Judges, and Dean D. Pregerson, District Judge.*

Opinion by Judge D.W. Nelson

*The Honorable Dean D. Pregerson, United States District Judge for the
Central District of California, sitting by designation.

## COUNSEL

John B. Arum, Seattle, Washington, for the plaintiff-appellant.

Claudia M. Newman, Seattle, Washington, for the plaintiff-appellant.

Elaine Spencer, Seattle, Washington, for the defendant-intervenor-appellee/cross-appellant.

Ronald M. Spritzer, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C., for the defendant-appellee.

## ORDER

The opinion filed on March 15, 2004, appearing at 361 F.3d 1108 (9th Cir. 2004) is amended as follows:

Page 3150, lines 1-2: delete "*See Public Citizen v. Dep't of Transp.*, 316 F.3d '1002, 1014 (9th Cir. 2002)."

Page 3164, line 7: replace "dock" with "refinery"

Page 3167, lines 6-14: replace "With the dock extension, though, the BP facility 'can handle additional traffic beyond what market forces might bring about alone. The New platform facilitates an increase in tanker traffic and is a "but for" cause of this increase in tanker traffic even if it is not the sole source of the increase. *Public Citizen*, 316 F.3d at 1024 (holding that even where "it is impossible to separate" the causes of increases in traffic, the influence of the challenged activity on increased traffic is still an important causal effect)." with "With the dock extension, though, the BP facility can handle even greater increases in traffic, should market forces dictate such increases. Because a "reasonably close causal relationship" exists between the Corps' issuance of the permit, the environmental effect of increased vessel traffic, and the attendant increased risk of oil spills, the Corps had a duty to explore this relationship further in an EIS. *Public Citizen v. Dep't of Transp.*, 124 S.Ct. 2204, 2215 (Jun. 7, 2004) (quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983))."

Page 3170, line 18: insert the following two new paragraphs after the paragraph ending "impacts accurately.": "In granting summary judgment for the Corps and BP on OA's environmental claims, the district court found that NEPA did not require an EIS because the pier extension was intended to alleviate existing tanker traffic, which would increase due to market forces with or without the extension. To reach this decision, the district court erroneously determined that the intent of the dock extension was to deal with existing traffic and analogized to our decisions in *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569 (9th Cir. 1998), and *Seattle Community Council Federation v. FAA*,

961 F.2d 829 (9th Cir. 1992), where the purpose of the proposed project was to increase efficiency and safety. *Ocean Advocates*, 167 F. Supp. 2d at 1212-13. Here, however, neither the Corps nor BP has proven that the purpose of the pier extension is primarily to increase efficiency and safety. Instead, the 1996 permit states that the "Need and Purpose" of the project is to "expand a petroleum product loading/unloading facility." Neither the 2000 amended permitting decision nor BP's form application for a permit indicates that the central purpose of the project is to increase safety or efficiency. *Morongo* and *Seattle Community Council Federation* are also distinguishable because neither case dealt with any change in ground capacity. In both cases, the increased flight volume was a function of new routes into the same airport terminal, whereas in this case whatever increase in tanker traffic may occur results from the expansion of the pier itself.

"Finally, our cases applying a "growth-inducing" analysis to highway construction projects do not require a different result. In *City-of-Carmel-By-The-Sea v. U.S. Department of Transportation*, 123 F.3d 1142 (9th Cir. 1997), we held that a proposal to build a new bridge, two new interchanges, and to widen an intersecting road was necessitated by existing development and did not require further analysis in the EIS because whatever growth may occur was already accounted for and analyzed by local officials planning documents. *Id*. at 1162-63. Here, by contrast, even if we found that the pier expansion was necessitated by existing development, the foreseeable growth in tanker traffic has not been accounted for in any other planning documents."

Page 3171, line 8: insert "No such analysis is evident in the EA, nor is there a " 'justification regarding why more definitive information could not be provided.' " *Blue Mountains*, 161 F.3d at 1213 (quoting *Neighbors of Cuddy Mountain*, 137 F.3d at 1380)." after "in the area."

Page 3172, line 33: insert "We decline to reach a decision on injunctive relief. Instead, we remand to the district court to consider this question in the first instance, including whether OA has made the requisite showing for injunctive relief, what harm BP may suffer under an injunction, and the impact of such an injunction on the public." After "remedy OA's harm."

Page 3179, lines 8-14: replace "The district court also should enter an injunction freezing tanker traffic to and from the BP refinery at pre-2000 levels until the Corps prepares an EIS and reassesses the permit under the Magnuson Amendment. *See Metcalf*, 214 F.3d at 1146; *Nat'l Parks*, 241 F.3d at 739. The district court first will have to determine pre-2000 tanker traffic levels. *Id*." with "We also REMAND this case to the district court to consider OA's request for injunctive relief. On remand on this question, the district court should conduct an evidentiary hearing to consider whether the pier extension would increase vessel traffic beyond the increase produced by market forces and what harms BP may suffer under an injunction."

With this amendment, the members of the panel that decided this case voted unanimously to deny Appellee's petition for rehearing. Judge Thomas voted to deny the petitions for rehearing en banc. Judges D. Nelson and D. Pregerson recommended denial of the petitions for rehearing en banc.

The full court has been advised of the petitions for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. (Fed. R. App. P. 35.)

The petitions for rehearing/rehearing en banc en banc filed on May 24, 2004, and June 4, 2004, are hereby DENIED.

Subsequent petitions for panel rehearing or petitions for rehearing en banc may be filed.

**OPINION**

D.W. NELSON, Senior Circuit Judge:

Ocean Advocates (OA), an environmental group, appeals a summary judgment ruling in favor of the U.S. Army Corps of Engineers (the Corps) and BP West Coast Products (BP).[1] OA challenges the issuance and extension of a permit allowing BP to build an addition to its existing oil refinery dock in Cherry Point, Washington. OA argues that the district court erred in granting summary judgment to the Corps and BP, insisting that the permit violates the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, and the Magnuson Amendment to the Marine Mammal Protection Act (MMPA), 33 U.S.C. § 476. BP cross-appeals the district court's denial of its motion for summary judgment on grounds that OA lacks standing and that laches bars this action.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand.

### FACTUAL AND PROCEDURAL BACKGROUND

*I.   Cherry Point Marine Terminal*

Cherry Point is an approximately ten-mile stretch of coastline located in the Strait of Georgia in northeast Puget Sound. It has been described as "a shoreline of statewide significance," by the Whatcom County Hearing Examiner.

BP first constructed a refinery to process Alaskan North Slope crude oil in Cherry Point, south of Point Whitehorn, in 1971. The 1969 permit authorizing this project allowed BP to construct a dock to which tankers would deliver crude oil.

---

[1]The Atlantic Richfield Company (ARCO) was the original party to this suit, but BP West Coast Products LLC now owns ARCO. Therefore, we use "BP" throughout.

The dock design included two platforms: one for unloading crude oil and one for loading refined product. Just before construction began, BP opted to build only the southern platform and deferred building the northern platform until production at the refinery reached capacity or the loading and unloading of tankers began to interfere with refinery operations. Physical adjustments enabled the southern platform both to unload crude oil and to load refined product so that the dock could function as it would have with both platforms.

BP sought to have the 1969 permit reopened in 1977 so that it could complete the original design of the pier by building the northern platform. Because of the time lapse between granting the original permit and the request to reopen, the Corps required BP to submit a new permit application that would be subject to public notice and comment. BP withdrew the application.

## II.   The Permit at Issue

BP again applied for a permit to build the northern platform in 1992. The additional platform would double the refinery's berthing capacity. The existing southern platform would cease to serve the dual functions of unloading crude oil and loading refined oil. Instead, the southern platform would only receive crude oil, while the northern addition would only load refined product.

The Corps provided public notice of the application on June 3, 1992, and received substantive responses from the U.S. Fish and Wildlife Service (FWS), the Lummi Indian Nation, and the Nooksack Indian Tribe.

The FWS raised concerns about the cumulative impact of the construction and operation of the pier when considered together with similar industrial projects in the Strait of Georgia. The FWS worried that the additional platform would facilitate an increase in tanker traffic and product handling,

thereby increasing the likelihood of a major oil spill. Three years after the public notice, but before the permit was issued, the FWS requested an environmental impact statement (EIS) to assess increased traffic and the cumulative impact of the additional platform.

In response, BP insisted that the dock expansion would *decrease* the risk of oil spills because the new dock would reduce the amount of time tankers spent anchored at sea while waiting to dock. Therefore, BP argued, the additional dock would diminish the potential for oil spills "during anchorage and bunkering," when ships are most vulnerable. BP also noted that in the event of a spill, the new dock would contain "state of the art" oil spill containment equipment.

Other public comments were similar. The Lummi Indian Nation expressed concern that the new platform would, among other things, increase tanker traffic and the risk of oil spills and requested that the Corps require an EIS before issuing the permit. The Nooksack Indian Tribe had similar misgivings. Its primary worry was that greater vessel traffic would mean increased handling of fuel and other toxic substances, which, in turn, would create a larger risk of harm to fish resources. Both the Lummi Nation and the Nooksack Tribe entered mitigation agreements with BP and ultimately withdrew their objections to the permit.

Meanwhile, the marbled murrelet[2] was listed as a threatened species under the Endangered Species Act, 16 U.S.C. §§ 1531-44. *See* 50 C.F.R. § 17.11 (2002). The Corps accordingly asked BP to consider how the dock addition would affect this bird. BP concluded that although "[m]arbled murrelet[s] are susceptible to death or injury from oil spills" and

---

[2]The marbled murrelet is a small seabird that nests in the old-growth forests of the Pacific Northwest and depends on coastal marine feeding areas. Sustainable Ecosystems Institute, SEI Endangered Species: Marbled Murrelet, http://www.sei.org/murrelet.html (last visited July 17, 2003).

although "[o]il spills are chance events that could have an impact on local populations of murrelets near Cherry Point," an oil spill containment boom made that already "remote" threat "negligible."

The Corps granted the permit on March 1, 1996, concluding that constructing the northern platform probably would not result in adverse cumulative impacts to fish and wildlife resources in the Cherry Point area. The Corps also agreed with BP that the project would reduce the chance of oil spills while ships anchored because the pier extension would decrease tanker wait time. Moreover, the Corps found that the additional pier likely would diminish the devastation associated with an oil spill during bunkering of tankers at dock because oil spill containment booms would surround the new platform. The Corps also made a Finding of No Significant Impact (FONSI), determining that the pier addition "will not significantly affect the quality of the human environment," and that an EIS therefore was not required.

OA contacted the Corps on October 9, 1997, asking it to reopen the permit granted BP and requesting a more complete evaluation of the cumulative impacts that the new platform would have on vessel traffic safety. OA also asked the Corps to consider whether the permit violated the Magnuson Amendment, 33 U.S.C. § 476, which regulates permits for oil transport terminals in Puget Sound. The Corps declined to reopen or reconsider the permit.

In July 1999, the Washington State Department of Natural Resources (WSDNR) issued a Screening Level Ecological Risk Assessment (SLERA). This report concluded that additional ship traffic associated with the expanded pier would elevate the probability of an oil spill. Although the reduction in temporary anchoring while waiting to dock would decrease the chance of an oil spill, the SLERA noted that the number of vessels using the pier would increase eighteen to thirty-six percent over five years, which would increase the likelihood

of an oil spill. This increase in ship traffic would occur, according to the SLERA, whether or not BP built the pier extension.

OA contacted the Corps on September 29, 1999, and again asked it to reconsider the permit. OA argued that the Corps' previous denial of its request to reopen the permit relied on inaccurate information, including that the refinery was operating "at capacity." New data demonstrated that the refinery had increased its output and that the project would promote additional tanker traffic and an increased potential for an oil spill. For these reasons, OA suggested that the permit violated the Magnuson Amendment and requested a "full" EIS.

The Corps asked BP to address OA's concerns. BP continued to allege that the dock extension would benefit the environment by reducing the risk of oil spills; any further environmental analysis was unnecessary. As for the Magnuson Amendment claim, BP pointed to the statutory language, which prohibits permits that "may result in any increase in the volume of *crude* oil capable of being handled" at a facility. *Id.* (emphasis added). The new dock could not violate the Magnuson Amendment, BP argued, because the northern pier would load only *refined* oil. In addition, BP noted that the northern platform would leave the refinery pipes untouched, meaning that the refinery's pumping or hydraulic capacity— the facility's ability to process crude oil—would remain unaltered. Finally, BP disputed OA's claim that the dock extension would be the main cause of increased vessel traffic.

## III. BP's Request for a Permit Extension

BP requested a one-year extension to its 1996 permit in March 2000 to allow it time to complete the dock construction. The original permit was set to expire on March 1, 2001, and BP wished to begin construction in June 2000 and finish by late 2001. The Corps decided that while it would wait to grant BP the one-year extension pending FWS consultation on

whether the project would affect newly listed threatened species, it would not issue a public notice or accept public comments on the permit extension.

The WSDNR contacted the Corps about the permit extension. It expressed concern that its earlier report (the SLERA) was very narrowly focused on the pier extension alone and did not consider the cumulative effects of multiple projects on the Cherry Point region. While the WSDNR did not specifically oppose the extension, it noted that circumstances had changed since the Corps originally granted BP the permit, including the listing of the Puget Sound Chinook salmon and bull trout under the Endangered Species Act. The WSDNR communicated its continued concern about the potential cumulative impacts on the Cherry Point habitat for spawning herring and juvenile Chinook.

The Corps granted BP the permit extension on June 29, 2000. The Corps adopted BP's "reasonable" interpretation of the Magnuson Amendment. Because the pier construction would not increase the refinery's capability to offload crude oil tankers, the Corps determined that the pier extension complied with the Magnuson Amendment. The Corps also rejected OA's claim that devoting the pier extension exclusively to refined oil would free the existing portion of the dock to unload more crude oil, effectively increasing the volume of crude oil capable of being handled at the BP facility. The Corps agreed with BP that increased tanker traffic depends not on the remodeling of the refinery but exclusively on market forces. The Corps, relying on information primarily from BP, found that the new platform would not result in adverse cumulative impacts on natural resources in the Cherry Point area. The Corps again concluded that an EIS was not essential to determining the cumulative impacts, if any, of the project.

## IV.   The District Court's Decision

OA brought this action against the Corps on November 21, 2000. The district court allowed BP to intervene as a defen-

dant, and the parties filed cross-motions for summary judgment. The district court granted summary judgment for the Corps and BP as to OA's environmental claims. In doing so, the court found that NEPA did not require an EIS because the pier extension was intended to alleviate existing tanker traffic and because tanker traffic would increase with or without the dock extension. The court also adopted the Corps' interpretation of the Magnuson Amendment. Finally, the district court concluded that BP's request for a permit extension did not require a period of public notice and comment. *See Ocean Advocates v. United States Army Corps of Engineers*, 167 F. Supp. 2d 1200 (W.D. Wash. 2001). The district court also denied BP's summary judgment motion with respect to claims that OA did not have standing and that laches barred this action. *Id.*

Following the court's entry of judgment, the parties stipulated to an injunction that prohibits the use of the dock extension for loading or unloading crude oil, unless BP applies for a permit. The terms of the injunction provide that even if BP receives a permit for using the dock extension to load or unload crude oil, BP cannot use the new platform to load and unload crude oil at the same time that it also uses the original southern platform for that purpose. The injunction essentially allows BP to use only one of the two Cherry Point platforms for loading and unloading crude oil at any time.

## STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir. 2002). We "must determine, viewing the evidence in the light most favorable to the nonmoving party, whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact." *Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc).

The Administrative Procedure Act (APA) governs our review of the Corps' action, conclusions, and findings of fact.

Section 10(a), 5 U.S.C. § 702, sets out the standard for judicial review of decisions involving NEPA, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990), and the MMPA, 16 U.S.C. § 1374(d)(6) (allowing judicial review of MMPA permit decisions under the APA). We must set aside the Corps' actions, findings, or conclusions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

This review is "searching and careful," but the arbitrary and capricious standard is narrow, and we cannot substitute our own judgment for that of the Corps. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). We ask "whether the [Corps'] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416. We also "must determine whether the [Corps] articulated a rational connection between the facts found and the choice made." *Ariz. Cattle Growers' Ass'n v. United States Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001). Our review "must not 'rubber-stamp' . . . administrative decisions that [we] deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Id.* (quoting *NLRB v. Brown*, 380 U.S. 278, 291-92 (1965)) (first alteration in original).

## DISCUSSION

### I.   *Standing*

Before considering the substantive merits of the claims raised on appeal, we must first address OA's standing.[3]

---

[3]OA sued along with three other environmental organizations, Fuel Safe Washington, the North Cascades Audubon Society, and ReSources, as well as a commercial fisherperson, Dan Crawford. Although all of these plaintiffs-appellants can demonstrate standing, OA's standing alone suffices for purposes of this appeal. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1991).

OA must establish that it meets both the constitutional and prudential standing requirements. Article III standing requires that OA

> show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). OA must also demonstrate that its interests fall within the "zone of interests" protected by NEPA and the Magnuson Amendment to satisfy prudential standing. *Bennett v. Spear*, 520 U.S. 154, 162 (1997).

OA is a nonprofit organization dedicated to protecting oceans for the people and wildlife dependent upon them for "life, livelihood, and enjoyment." OA executives have committed themselves to preventing oil spills in the waters contiguous to Washington State for more than two decades. OA members own property on Haro Strait on San Juan Island and enjoy photographing marine life, fishing for salmon and shellfish, and watching marine life.

The director of OA, Fred Felleman, owns waterfront property en route to the BP refinery. He works as a marine biologist studying orca whales in Puget Sound and earns most of his income as a professional marine wildlife photographer. Increased tanker traffic, the discharge of pollutants, and the risk of oil spills will jeopardize his professional, economic, and personal interests in Cherry Point.

### A.   Injury in Fact

**[1]**   [A]n individual can establish 'injury in fact' by showing a connection to the area of concern suffi-

cient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded.

*Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000). Record evidence suggests that the dock extension risks increased tanker traffic and a greater potential for an oil spill corresponding increase in the risk of an oil spill; we are persuaded that OA will suffer substantially lessened enjoyment of Cherry Point should an oil spill occur. An oil spill would cause a markedly decreased opportunity for OA members to study the ecological area, observe wildlife, and use Cherry Point for recreation. Felleman's interests as a member of OA, a professional, and a property owner also would be harmed. Because "[t]he 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct," OA has shown injury in fact. *Id.* at 1147.

Furthermore, the alleged injury is not conjectural or hypothetical, as "an increased risk of harm can itself be injury in fact for standing," and nothing necessitates a showing of existing environmental harm. *Id.* at 1151. "[T]o require actual evidence of environmental harm, rather than an increased risk based on a violation of [a] statute, misunderstands the nature of environmental harm" and would unduly limit the enforcement of statutory environmental protections. *Id.* (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000)).

### B. Causation

[2] The injury also is fairly traceable to the BP pier. OA has shown that "the alleged injury can be traced to [BP's] chal-

lenged conduct, rather than to that of some other actor not before the court." *Ecological Rights Found.*, 230 F.3d at 1152. At the time litigation commenced, all parties agreed that BP would build the new platform and that traffic to the dock extension would increase over time. OA has alleged sufficiently that the dock extension, when considered alone or in tandem with other industrial projects in the Cherry Point region, would contribute to the risk of an oil spill. "[T]he causal connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties, but need not be so airtight at this stage of litigation as to demonstrate that the plaintiffs would succeed on the merits." *Id.* (reversing grant of summary judgment). While other factors may also cause additional tanker traffic and increase the attendant risk of an oil spill, the link between the new platform and increased traffic is not tenuous or abstract.

## C.   *Redressability*

**[3]** The last prong required for constitutional standing, redressability, also is present here, as the relief OA has requested will remedy its harm. OA conceded at oral argument that it does not wish to have the additional platform, which is now fully constructed, demolished. Instead, OA seeks an EIS under NEPA and an injunction pursuant to the Magnuson Amendment. An injunction restricting tanker traffic obviously would alleviate OA's concern about increased traffic. The other remedy, which is procedural in nature, would also redress OA's injury.

> A plaintiff, like [OA] who asserts inadequacy of a government agency's environmental studies under NEPA need not show that further analysis by the government would result in a different conclusion. It suffices that, as NEPA contemplates, the [Corps'] decision *could* be influenced by the environmental considerations that NEPA requires an agency to study.

*Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001) (emphasis added) (citation omitted). If the Corps had conducted a "full" EIS considering increased traffic and the cumulative impact of the dock extension as OA requested, the Corps' decision to grant BP the permit and the permit extension could have been influenced by those environmental studies. OA certainly meets this undemanding burden.

## D.    Prudential Standing

**[4]** OA easily meets the prudential standing requirement because its injuries are within the zone of interests protected by NEPA and the Magnuson Amendment. The zone of interests test is "not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). OA need only show that its interests share a "plausible relationship" to the policies underlying each statute. *Id.* at 403. Prudential standing is satisfied unless OA's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* at 399.

OA's interests clearly meet the lenient zone of interests test. Congress drafted NEPA in order to protect the environment, by "fulfill[ing] the responsibilities of each generation as trustee of the environment for succeeding generations" and "attain[ing] the widest range of beneficial uses of the environment without degradation." 42 U.S.C. § 4331(b). The Magnuson Amendment attempts to reduce the threat of "increased domestic and international traffic of tankers carrying crude oil in bulk which increases the possibility of vessel collisions and oil spills." 33 U.S.C. § 476(a)(2). It is without question that OA seeks to avoid the harmful effects of increased tanker traffic, and relatedly, the increased risk of oil spills, an objective that matches the aim of the Magnuson Amendment as well as the general goal of environmental protection lauded in NEPA.

*E.    Organizational Standing*

OA also must satisfy us that it has organizational standing. OA can successfully allege organizational standing if its members would have standing to sue on their own behalf, the interests at issue are "germane" to OA's mission, and neither the substantive claim nor the remedy sought necessitates the participation of any individual member of OA. *Laidlaw*, 528 U.S. at 181 (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 324 (1977)).

**[5]** We hold that OA has organizational standing. The above analysis demonstrates that Felleman would have standing as an individual to sue BP. OA's main interest, namely foreclosing the increased risk of an oil spill, certainly is germane to OA's purpose of protecting and preserving oceans for humans and animals who rely on them. We cannot see how the participation of any individual member of OA would aid the determination of liability, an appropriate remedy, or both, let alone how such involvement would prove necessary.

*F.    Statutory Standing*

**[6]** Finally, OA must persuade us that it meets the APA statutory requirements for standing. *Churchill County v. Babbitt*, 150 F.3d 1072, 1078 (9th Cir. 1998). OA "must establish (1) that there has been a final agency action adversely affecting the plaintiff, and (2) that, as a result, it suffers legal wrong or that its injury falls within the 'zone of interests' of" NEPA and the Magnuson Amendment. *Id.* We have already established that OA's claims fall within the purview of both NEPA and the Magnuson Amendment. The only remaining question, then, is whether a final agency action adversely affected OA. We hold that the permit that the Corps issued qualifies as such a final agency action.

*II.    Laches*

We next turn to BP's claim that laches bars this action, as a reversal on this claim would make consideration of the other issues unnecessary.

Laches is strongly disfavored in environmental cases. *Coalition for Canyon Pres. v. Bowers*, 632 F.2d 774, 779 (9th Cir. 1980). "The doctrine is to be invoked sparingly in environmental cases because the plaintiff is not the only party to suffer harm by alleged environmental damage." *Neighbors of Cuddy Mountain v. United States Forest Serv.*, 137 F.3d 1372, 1381 (9th Cir. 1998); *see also Coalition for Canyon Pres.*, 632 F.2d at 779 ("In considering laches claims, it is relevant that the plaintiff will not be the only victim of possible environmental damage."). The use of laches "should be restricted to avoid defeat of Congress' environmental policy." *Coalition for Canyon Pres.*, 632 F.2d at 779.

[7] Whether laches bars a claim depends on the particular facts and circumstances of the case at bar, and the decision to apply laches is within the discretion of the trial court. To establish a laches bar as an affirmative defense to this litigation, BP must show that OA lacked diligence in pursuing its claim and that OA's lack of diligence resulted in prejudice. *Id.*

In determining diligence, we consider several factors: whether OA attempted to make its position known to the Corps before filing suit; the Corps' response to OA's efforts; and whether developments, such as construction or other visible changes, motivated OA to investigate whether any legal basis existed for challenging the project. *Id.*

The parties dispute the date from which we ought to measure OA's diligence in filing this action. BP argues that OA should have brought suit soon after the Corps granted the permit in 1996, while OA points out that it filed suit within a reasonable time following the Corps' extension of BP's permit in 2000. Whether we "run the diligence clock" from the 1996 permit or the 2000 permit extension, OA exercised due diligence.

BP first sought the permit in 1992 and the Corps granted it in 1996. OA initiated contact with the Corps within one

year of when the first permit was granted. It maintained continued and consistent dialogue with the Corps until the Corps granted the permit extension in June 2000.

The permit extension granted in 2000 gave BP the final authorization it needed to construct the dock extension. BP admitted that it "definitely" could not have completed construction by the original permit expiration date, making an extension necessary to build the new platform lawfully. Also, additions to the threatened species list in the time since the permit was granted effectively suspended the force of the permit. In February 2000, a month before BP applied for a permit extension, the Corps understood that even though BP did not intend to begin construction until June 2000, new additions to the threatened species list effectively halted the project. In an email between two Corps members, one wrote to the other:

> [BP] really need[s] to agree not to start work until [ESA consultation] is completed or else we are in a suspension mode in my legal opinion. Do they [BP] realize that they are not to start work? . . . We don't want them expending money or setting up contracts without them [really] understanding that they need to go through [ESA] consultation.

The additions to the threatened species list effectively suspended the force of the permit until ESA consultation was complete, and BP did not have final authorization to begin construction. Moreover, the permit extension granted in 2000 addressed, for the first time, whether the dock extension project would violate the Magnuson Amendment.

We have held in other cases that delays of eight to ten years did not demonstrate lack of diligence when litigation commenced close in time to the final agency decision or authorization. *See Coalition for Canyon Pres.*, 632 F.3d at 780 (finding no laches bar where final authorization was not granted until one year before plaintiffs sued, although ten

years passed overall); *Pres. Coalition, Inc. v. Pierce*, 667 F.2d 851, 854-55 (9th Cir. 1982) (finding no laches bar where plaintiffs filed suit the same year they found out that the action they feared would take place). Within six weeks of when the Corps granted BP the June 2000 permit extension, OA notified the Corps of its intent to sue and actually filed suit approximately three months later.

Even were we not satisfied that the 2000 permit extension provided BP with the final authorization it needed to construct the new platform, the factors relevant to the diligence inquiry demonstrate that OA has met its burden. First, OA made its position known to the Corps before filing suit. OA requested that the Corps reopen BP's permit twice and strongly encouraged the Corps to consider a Magnuson Amendment violation, which it had not evaluated previously. The record contains many examples of the continued correspondence between OA and the Corps concerning the permit at issue.

Second, the Corps responded with letters that gave OA reason to believe that continuing to pursue administrative remedies with the Corps might resolve the problem without having to litigate. For example, OA pointed out to the Corps that it denied OA's first request to reopen BP's permit on the basis of a mistaken belief that BP's Cherry Point refinery was operating "at capacity." After learning of this error, the Corps notified OA that it was reevaluating its earlier denial of OA's request to reopen the permit. In the meantime, the Corps gathered more information from both parties. The Corps also knew that BP did not plan to begin construction on the dock until June 2000 and wanted to make sure that OA was aware of this information, suggesting that OA reasonably believed that efforts beyond administrative remedies might not be necessary.[4] Furthermore, OA made its second request to reopen the

---

[4]The same email discussed earlier contained the following statement: "In our conversation on Friday, I forgot to ask if you informed Ocean Advocates that [BP] was not going to start construction until June."

permit in September 1999, and the Corps responded as late in time as May 22, 2000, that it was "considering [OA's] request to suspend the BP permit for the dock extension based on a change in circumstances since permit issuance and based on a possible violation of the Magnuson Amendment." It would prove particularly unfair to OA, and the public, to find that laches bars this action when OA reasonably attempted to resolve its Magnuson concerns administratively in the first instance before spending the necessary time and expense to litigate.

Finally, no visible developments existed that would have motivated OA to investigate any additional legal bases for challenging the permit or to prompt it to file suit. Although Felleman knew about the permit in 1996, public notice of the 1992 permit application was not mailed to any of the plaintiffs-appellants. BP did not begin construction on the dock until June 2000, when the Corps granted the extension.

OA's continuous dialogue with the Corps before it filed suit is unlike the facts in *Apache Survival Coalition v. United States*, 21 F.3d 895 (9th Cir. 1994), one of the rare instances in which we found that laches barred an environmental suit. There, the plaintiff tribe ignored or provided no information in response to targeted solicitations requesting input for an EIS and asked to be removed from the mailing list for the final EIS. *Id.* at 907. We held that the tribe asserted its rights with "inexcusable tardiness" when it complained to the Forest Service two years after the final EIS had issued and the administrative record had been closed. *Id.* at 907, 912. No analogous facts exist in this case.

**[8]** Because BP has failed to show a lack of diligence, we have no need to examine undue prejudice.

*III. NEPA*

OA challenges the Corps' failure to prepare an EIS prior to granting BP's permit application and permit extension application.

**[9]** The relevant provision of NEPA provides that "all agencies of the Federal Government shall . . . include in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official." 42 U.S.C. § 4332(2)(C). This report, or EIS, considers the environmental impact of the proposed project.

Not every project necessitates an EIS. Where an EIS is not categorically required, the agency must prepare an Environmental Assessment to determine whether the environmental impact is significant enough to warrant an EIS. 40 C.F.R. §§ 1501.3, 1508.9; *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000). If the action will significantly affect the environment, an EIS must be prepared, while if the project will have only an insignificant effect, the agency issues a FONSI. 40 C.F.R. §§ 1501.3, 1501.4.

**[10]** NEPA aims to establish procedural mechanisms that compel agencies, such as the Corps, to take seriously the potential environmental consequences of a proposed action. We have termed this crucial evaluation a "hard look." *Kern v. United States Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002). The Corps cannot avoid preparing an EIS by making conclusory assertions that an activity will have only an insignificant impact on the environment. *See Alaska Ctr. for Env't v. United States Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999). If an agency, such as the Corps, opts not to prepare an EIS, it must put forth a "convincing statement of reasons" that explain why the project will impact the environment no more than insignificantly. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). This account proves crucial to evaluating whether the Corps took the requisite "hard look" at the potential impact of the dock extension. *Id.*

**[11]** "[A]n EIS *must* be prepared if 'substantial questions are raised as to whether a project . . . *may* cause significant

degradation of some human environmental factor.' " *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998) (quoting *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992)). "To trigger this requirement a 'plaintiff need not show that significant effects *will in fact occur*,' [but] raising 'substantial questions whether a project may have a significant effect' is sufficient." *Id.* at 1150 (quoting *Greenpeace*, 14 F.3d at 1332).

The Council on Environmental Quality has adopted regulations governing the implementation of NEPA. In determining whether a federal action requires an EIS because it significantly affects the quality of the human environment, an agency must consider what "significantly" means. The regulations give it two components: context and intensity. 40 C.F.R. § 1508.27. Context refers to the setting in which the proposed action takes place, in this case Cherry Point. *See id.* § 1508.27(a). Intensity means "the severity of the impact." *Id.* § 1508.27(b).

In considering the severity of the potential environmental impact, a reviewing agency may consider up to ten factors that help inform the "significance" of a project, such as the unique characteristics of the geographic area, including proximity to an ecologically sensitive area; whether the action bears some relationship to other actions with individually insignificant but cumulatively significant impacts; the level of uncertainty of the risk and to what degree it involves unique or unknown risks; and whether the action threatens violation of an environmental law. *Id.* § 1508.27(b)(3), (5), (7), (10). We have held that one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances. *See Nat'l Parks & Conservation Ass'n v. Babbit*, 241 F.3d 722, 731 (9th Cir. 2001).

The Corps has failed to provide the requisite convincing statement of reasons explaining why the dock extension would have only a negligible impact on the environment and

therefore has left us unpersuaded that it took a "hard look" at the environmental impact of the dock extension. Moreover, the permit necessitated an EIS because OA raised a substantial question as to whether the dock extension *may* cause *significant* degradation of the environment. *See Idaho Sporting Cong.*, 137 F.3d at 1149.

### A.    Convincing Statement of Reasons

In granting the 1996 permit, the Corps made a finding of no significant impact:

> Performance of this work, in accordance with the standard conditions of the permit, will not significantly affect the quality of the human environment. Further, [the Corps has] determined that the issuance of this particular permit is a Federal action not having a significant impact on the environment. [The Corps has] thus concluded that the preparation of a formal Environmental Impact Statement is not required.

This finding fails to provide *any* reason, let alone a convincing one, why the Corps refrained from preparing an EIS. The only portion of the 1996 permit that *might* be considered a statement of reasons—if construed quite liberally—is the Corps' discussion of the FWS' concern about the cumulative impact of the pier extension. We conclude, however, that this neither qualifies as a statement of reasons nor convinces us that a comprehensive environmental impact report was unnecessary.

[12] The Corps recounted the concerns that the FWS raised, namely increased tanker traffic that would raise the risk of an oil spill, and BP's response to those concerns in the text of the 1996 permit. The Corps then concluded:

> The new pier also should reduce the chance of oil spills during bunkering of tankers at dock, as the

ships will be surrounded with containment booms while moored at the dock. The project will also reduce turnaround time for tankers at anchorage, thus reducing the chance for oil spills while at anchor. The Corps concludes that the proposed facility should result in a reduction in the chances for oil spills.

We find this determination unsatisfactory, even if it could be interpreted as a statement of reasons obviating the need for an EIS. First, the Corps never explicitly adopted the claim that the project could result in an increase in tanker traffic, leaving us to guess whether it took a hard look at, or even considered, this obvious potential impact. Second, the Corps notes in its summation of BP's arguments that the dock "will not lead to an increase in the [BP] refinery capacity, as the refinery is already working at maximum capacity." This statement cannot possibly qualify as a fully informed and well-reasoned basis for failing to give more careful attention to the potential for increased traffic. BP alleged that its refinery was operating "at capacity," but the Corps never explicitly adopted or relied on this contention, and OA later disproved this claim when it sought to reopen the permit. A patently inaccurate factual contention can never support an agency's determination that a project will have "no significant impact" on the environment. Third, the Corp relied wholly on BP's claims that the project would reduce oil spills because of containment booms and reduced anchoring time to conclude that the dock extension would decrease the potential for an oil spill. This claim alone, without a reasoned evaluation of the potential for increased traffic, which is at least in part due to the Corps' erroneous conclusion that the refinery was operating at full capacity, does not inspire any confidence that the Corps took the hard look that we require.

[13] The permit extension granted in 2000 proves equally deficient. Again, the Corps made a finding of no significant impact:

> [The Corps has] determined that performance of the work, as revised and extended in accordance with the conditions of the permit, will not significantly affect the quality of the human environment. Further, [the Corps has] determined that the revision and extension of this particular permit is a Federal action not having a significant impact on the environment and thus [has] concluded that the preparation of a formal Environmental Impact Statement is not required.

Here, too, the Corps failed to provide *any* reason why an EIS was unnecessary. As before, even a generous reading of the rest of the permitting decision as a statement of reasons supporting the Corps' decision not to prepare an EIS, fails to convince us that the Corps took the obligatory hard look.

In discussing OA's concern that the project would have adverse cumulative effects on the Cherry Point area, the Corps reasoned:

> In the original permit review for the [BP] project, the Corps made a determination of no significant impact and determined that an EIS was not necessary. [The Corps has] again reviewed possible cumulative impacts of this project and again determined that an EIS is not necessary to review those cumulative impacts.

Before coming to this conclusion, the Corps cited to a Biological Evaluation (BE) that BP had prepared, which found that the dock extension would not increase vessel traffic, and a letter from BP stating that only market forces, and not the additional pier, would increase total vessel traffic. The permitting decision includes absolutely no discussion about the tenability or reasonableness of BP's self-serving claims that the dock extension would not increase vessel traffic. While the designation of Cherry Point as an aquatic reserve—an action that

prohibited additional terminals in the area—necessarily reduces the future cumulative impact from all projects in the area, the Corps still failed to demonstrate in the 2000 permit extension that it critically evaluated the potential increase in tanker traffic from the dock extension alone. Common sense suggests that BP may have hoped that its sizable investment in the dock would facilitate its ability to handle a greater number of tankers a day, thereby increasing tanker traffic to the facility. The Corps' failure to look through BP's claims that it wanted only to increase its efficiency in handling existing congestion and its consequent failure to consider increased vessel traffic as a likely result of the project is unreasonable and insufficiently explained. Given evidence of increasing tanker traffic throughout the 1990s and BP's admission that demand for refined product may increase considerably, the Corps at a minimum should have analyzed and evaluated BP's claims that vessel traffic would not increase.

### B.   Substantial Question as to a "Significant" Impact on the Environment

OA has raised a substantial question as to the dock extension's potential significant impact on the environment. As just discussed, the Corps did not consider the potential for increased tanker traffic when it granted the 1996 permit, other than to mention—erroneously—in its recitation of BP's contentions that the dock extension would not result in increased tanker traffic because the refinery was operating at maximum capacity. The 2000 permit extension decision did not revisit this omission, instead relying exclusively on BP's expedient assertion that the project would not increase tanker traffic.

[14] Without even considering the factors outlined by the Council on Environmental Quality, OA has raised a substantial question about the intensity of the impact that increased tanker traffic would have on Puget Sound; in fact, the "severity of the impact" would be unquestionably severe. The Corps ignored record evidence that the dock could not handle much

additional traffic. In its 1992 permit application, BP noted that the use of the pier increased incrementally since the mid-1980s and that the pier was operating at seventy-four percent of its capacity, a figure it termed "a very high utilization rate that is considered close to, if not maximum practical utilization." In addition, a report that BP commissioned from an outside consultant expected "marine traffic, especially tanker traffic" to increase upon project completion. Because the new platform would double the berthing capacity of the dock, this factor also would contribute to an increase in the number of vessels able to and actually accessing the refinery. When added to the other traffic demands on the Cherry Point area, the cumulation of tanker traffic may well have a significant impact on the environment, and OA has raised a substantial question about this effect.

Since BP applied for the permit in 1992, its traffic has increased. Between 1995 and 1999, the refinery's throughput increased by 672,000 gallons per day on average. Tanker traffic accessing the BP refinery cannot continue to increase ad infinitum, especially if the dock was operating at or near capacity in 1992. This record evidence raises a substantial question as to whether the dock extension will result in increased tanker traffic.

We agree with the Corps and BP that market forces also would increase tanker traffic to the BP facility. The dock extension, however, also increases the facility's ability to handle increased tanker traffic. Were the dock extension never constructed, BP could handle some additional tanker traffic caused by increasing market demands. With the dock extension, though, the BP facility can handle even greater increases in traffic, should market forces dictate such increases. Because a "reasonably close causal relationship" exists between the Corps' issuance of the permit, the environmental effect of increased vessel traffic, and the attendant increased risk of oil spills, the Corps had a duty to explore this relationship further in an EIS. *Public Citizen v. Dep't of Transp.*, 124

S.Ct. 2204, 2215 (Jun. 7, 2004) (quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983)).

Increased tanker traffic elevates the risk of oil spills—an undeniable and patently apparent risk of harm to Puget Sound. An oil spill could destroy and disrupt ecosystems and kill or injure critical numbers of threatened and endangered species that live, and thrive, in the Cherry Point Region. The Corps failed to appreciate that the permitted activity would lead to increased tanker traffic, an error about the fundamental nature and severity of the impact that the dock extension would have. The obvious severity of the impact that increased tanker traffic poses is enough to warrant reversal on OA's NEPA claim. Were we unconvinced, however, some of the Council on Environmental Quality factors also demonstrate the significance of increased tanker traffic on this ecologically sensitive area, particularly cumulative significant impacts and uncertain environmental impacts.

### i.    Cumulatively Significant Impact

**[15]** The impact of an action is severe "if it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7). Cumulative impact is

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and *reasonably foreseeable future actions* regardless of what agency . . . or person undertakes such other actions. Cumulative impacts can result from *individually minor but collectively significant actions* taking place over a period of time.

*Kern*, 284 F.3d at 1075 (quoting *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001)). Moreover, in considering cumulative impact, an agency must provide "some quantified or detailed information; . . . [g]eneral statements about

possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain*, 137 F.3d at 1379-80 (internal quotation marks omitted). This cumulative analysis "must be more than perfunctory; it must provide 'a useful analysis of the cumulative impacts of past, present, and future projects.' " *Kern*, 284 F.3d at 1075 (quoting *Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800, 810 (9th Cir. 1999)). If the Corps' determination of cumulative impact is fully informed and well considered, we should defer to that finding. On the other hand, we "need not forgive a clear error in judgment." *Kern*, 284 F.3d at 1075 (internal quotation marks omitted).

The question of cumulative impact depends in part on the Cherry Point refinery and two other existing piers in close proximity: an aluminum plant and the Ferndale oil refinery. With these three facilities, not accounting for the dock extension, an average of fifteen large commercial vessels travel in the Strait of Georgia each day. Up to ten small boats also use the Strait daily. At the peak of the fishing season, more than 100 fishing boats also share the same waterways each day. Approximately 600 ships, including large commercial vessels and barges, travel to the Ferndale refinery each year, thirty travel to the aluminum plant, and 200 ships make trips to the BP pier each year. Another terminal, proposed by Gateway Pacific, was to be constructed south of the BP refinery and was expected to increase vessel traffic in the Strait from an average of two large commercial vessel movements per day to three per day.

The Corps concluded that the dock extension would not increase the number of crude oil tankers traveling in the Strait of Georgia and that any increase of crude oil tanker traffic would result from market forces, not the dock addition. The Corps based this conclusion on an unsubstantiated letter from BP, claiming that it had many options other than sea travel for transporting crude and refined oil to and from its refinery.

**[16]** This finding fails to convince us that the Corps took a "hard look" at the cumulative effects of the project, excludes the requisite quantified or detailed information necessary to support this finding, and neglects to explain why the Corps could not provide better or more specific information. In addition, it was reasonably foreseeable when BP applied for its permit that the dock extension, along with the existing and proposed projects, could lead to cumulatively significant environmental impacts.

As mentioned, the Corps did not appreciate the potential effect of increased tanker traffic. The Corps and BP point out that the SLERA found that increased vessel traffic would occur through 2002 regardless of whether the dock extension was built. Because long-term projections were unavailable, the authors of the SLERA "assumed that the pier extension will eventually support an increase in traffic." Reliance on this report is misplaced because the WSDNR, the author of the SLERA, contacted the Corps to clarify that its report was very narrow in scope, focusing only on the dock extension and not assessing the cumulative effects of multiple projects. Even if the SLERA considered the cumulative impact of other projects in the area, its vague and uncertain analysis of increased tanker traffic cannot qualify as quantified or detailed information.

In granting the permit in 1995, the Corps concluded that neither construction nor operation of the proposed project would produce oil pollution because the chance of accidental oil spills already existed before the dock addition. Moreover, the dock would include high-tech spill containment booms, and the more efficient operation of the dock would lessen the chance of oil spills by reducing the time vessels wait to dock and allowing refueling at the dock. The Corps found that there would be "a decrease in the chances of oil spills while tankers are moored at docks," but made no finding about the risk of oil spills while tankers traveled to those docks. The Corps did not provide any reason for ignoring the potential increase in

tanker traffic or declining to weigh the risk of oil spills while traveling against the reduced risk of a spill while docked. The Corps failed to consider how an increase in tanker traffic might reduce, or even outweigh, the alleged benefits of the new dock. This comparison would provide crucial information for assessing cumulative impacts accurately.

In granting summary judgment for the Corps and BP on OA's environmental claims, the district court found that NEPA did not require an EIS because the pier extension was intended to alleviate existing tanker traffic, which would increase due to market forces with or without the extension. To reach this decision, the district court erroneously determined that the intent of the dock extension was to deal with existing traffic and analogized to our decisions in *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569 (9th Cir. 1998), and *Seattle Community Council Federation v. FAA*, 961 F.2d 829 (9th Cir. 1992), where the purpose of the proposed project was to increase efficiency and safety. *Ocean Advocates*, 167 F. Supp. 2d at 1212-13. Here, however, neither the Corps nor BP has proven that the purpose of the pier extension is primarily to increase efficiency and safety. Instead, the 1996 permit states that the "Need and Purpose" of the project is to "expand a petroleum product loading/ unloading facility." Neither the 2000 amended permitting decision nor BP's form application for a permit indicates that the central purpose of the project is to increase safety or efficiency. *Morongo* and *Seattle Community Council Federation* are also distinguishable because neither case dealt with any change in ground capacity. In both cases, the increased flight volume was a function of new routes into the same airport terminal, whereas in this case whatever increase in tanker traffic may occur results from the expansion of the pier itself.

Finally, our cases applying a "growth-inducing" analysis to highway construction projects do not require a different result. In *City-of-Carmel-By-The-Sea v. U.S. Department of Transportation*, 123 F.3d 1142 (9th Cir. 1997), we held that

a proposal to build a new bridge, two new interchanges, and to widen an intersecting road was necessitated by existing development and did not require further analysis in the EIS because whatever growth may occur was already accounted for and analyzed by local officials planning documents. *Id.* at 1162-63. Here, by contrast, even if we found that the pier expansion was necessitated by existing development, the foreseeable growth in tanker traffic has not been accounted for in any other planning documents.

[17] The Corps' findings about cumulative impacts were perfunctory and conclusory and do not provide a helpful analysis of past, present, and future projects. *See Kern*, 284 F.3d at 1075. OA has raised a substantial question as to whether the pier addition would result in cumulatively significant negative environmental impacts, and the Corps clearly erred in not providing responsive quantified or detailed information.

### ii.  *Uncertainty*

Where the environmental effects of a proposed action are highly uncertain or involve unique or unknown risks, an agency must prepare an EIS. 40 C.F.R. § 1508.27(b)(5); *Nat'l Parks*, 241 F.3d at 731-32. "Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data or where the collection of such data may prevent 'speculation on potential . . . effects. The purpose of an EIS is to obviate the need for speculation . . . .' " *Nat'l Parks*, 241 F.3d at 732 (quoting *Sierra Club v. United States Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1998)) (citation omitted) (alteration in original).

The amount that tanker traffic might increase in relation to the dock extension was largely unknown. Presumably, data collection or projection analysis could have determined the likely increase in tanker traffic, considering market forces, the dock extension, and the cumulative impact of the existing and pending facilities in the area. No such analysis is evident in

the EA, nor is there a " 'justification regarding why more definitive information could not be provided.' " *Blue Mountains*, 161 F.3d at 1213 (quoting *Neighbors of Cuddy Mountain*, 137 F.3d at 1380). The Corps' "lack of knowledge does not excuse the preparation of an EIS; rather it requires [the Corps] to do the necessary work to obtain it." *Nat'l Parks*, 241 F.3d at 733. Concluding that a general risk, but not one attendant to the pier, exists, does not qualify as a hard look that would allow the Corps to skirt preparing an EIS.

Our recent decision in *Public Citizen* supports this holding. 316 F.3d at 1024-26. That case involved various Department of Transportation (DOT) regulations that would allow Mexican trucks to operate in the United States pursuant to NAFTA. *Id.* at 1009. We held that while all the parties had reason to believe that increased traffic would occur, the EA did not explore the reasons for the additional traffic, for example, whether the proposed agency action or a different cause would prompt an increase in traffic. *Id.* at 1025. DOT argued that any increases in traffic would depend on international trade agreements, not on the regulations, just as BP and the Corps maintain that increased tanker traffic depends only on market forces and not the additional pier. *Id.* DOT also argued that the proposed regulation likely would decrease air pollution, while BP and the Corps insist that the pier extension will reduce the risk of oil spills. *Id.* We rejected both arguments.

[18] The Corps' position was based entirely on BP's unsupported assertions, and the record reflects no convincing reason for the Corps' decision. The Corps should have realized that uncertainty surrounded the potential for increased traffic based on the undetermined additional berthing capacity at the BP refinery, the magnitude of this change and its relationship to the increased risk of oil spills, and unknown, long-term projections for increased traffic and the risk of an oil spill. OA has raised a substantial question about these uncertainties, and the Corps acted arbitrarily and capriciously in failing to gather this quantifiable data.

*C.    Remedy*

The fact that BP has completed construction of the dock extension does not alter our conclusion, as we can fashion an appropriate remedy. OA asks us to "order the corps to prepare an EIS that takes a 'hard look' at the direct, indirect, and cumulative impacts from any reasonably foreseeable increase in vessel traffic resulting from the facility." In addition, OA seeks injunctive relief, suggesting that we "direct the district court to issue an injunction freezing any vessel traffic to and from the facility at pre-2000 levels pending completion of the NEPA process." While NEPA is a procedural statute designed to avoid substantive environmental harms before they take place, and while the new platform is now fully functioning, OA challenges only the operation of the new platform and not its construction. OA conceded at oral argument that it did not seek destruction of the dock extension, but rather, sought a serious inquiry by the Corps into the extent to which the platform's *operation* would increase vessel traffic.

**[19]** Although construction of the dock extension is now complete, the Corps may impose conditions on the operation of permitted terminals at any time "to satisfy legal requirements or to otherwise satisfy the public interest." 33 C.F.R. § 325.4(a); *see also id*. § 325.6(b). If, for example, the Corps determined on remand that the operation of the dock may result in significant degradation of the environment, the Corps could impose restrictions on the operation of the dock or require other mitigating measures. Thus, requiring an EIS would remedy OA's harm. We decline to reach a decision on injunctive relief. Instead, we remand to the district court to consider this question in the first instance, including whether OA has made the requisite showing for injunctive relief, what harm BP may suffer under an injunction, and the impact of such an injunction on the public.

*IV.   Magnuson Amendment*

*A.   Statutory Text and Interpretation*

**[20]** The Magnuson Amendment mandates that

> [N]o officer, employee, or other official of the Federal Government shall, or shall have authority to, issue, renew, grant, or otherwise approve any permit, license, or other authority for constructing, renovating, modifying, or otherwise altering a terminal, dock, or other facility in, on, or immediately adjacent to, or affecting the navigable waters of Puget Sound, or any other navigable waters in the State of Washington east of Port Angeles, which will or may result in any increase in the volume of crude oil capable of being handled at any such facility (measured as of October 18, 1977), other than oil to be refined for consumption in the State of Washington.

33 U.S.C. § 476(b). No court has interpreted the Magnuson Amendment yet, making this case one of first impression.

"When constructing statutory language, we look first to its plain meaning." *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1157 (9th Cir. 2001). The Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). We should look at the plain meaning of the entire statute, in context, rather than the meaning of isolated sentences. *See Beecham v. United States*, 511 U.S. 368, 372 (1994); *see also Edelman v. Lynchburg College*, 535 U.S. 106, 120-21 (2002) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."

(quoting *Davis v. Mich. Dep't. of Treasury*, 489 U.S. 803, 809 (1989))).

### i.    *"Any Such Facility"*

**[21]** First, we must discern what "any such facility" means. "Any such facility" refers back to the phrase "terminal, dock, or other facility," which appears earlier in the statute. "Any such facility" here includes the entire terminal or facility—BP's self-termed Cherry Point Marine Terminal—not just the proposed northern dock extension by itself. When analyzing capacity, courts should therefore not look to the capacity of the refinery, but rather to the capacity of the terminal. Such an understanding is supported by the legislative history of the amendment; just before passage of the amendment, Senator Magnuson remarked: "In fact, the amendment only applies to construction or alteration of dock facilities in the Puget Sound region, not to refineries as such." 123 Cong. Rec. at 32,910.

### ii.    *"Volume of Crude Oil Capable of Being Handled": Capabilities of the New Platform*

**[22]** Regardless of BP's stipulation to prohibit the use of the dock extension for loading or unloading crude oil, the Corps may nevertheless have violated the Magnuson Amendment by issuing the permit if the permit otherwise allows for an increase in the volume of crude oil capable of being handled at the terminal. First we consider the question of whether the new platform can handle crude oil, both as a legal and a factual matter.

BP has maintained that the new platform cannot handle crude oil: "The pier addition is neither designed nor permitted for offloading crude oil, and as such has no crude handling capability." The district court made a number of relevant findings in this regard. The district court determined that the permit allowed for the construction of a "petroleum product loading/unloading facility," which, by definition, excludes the

use of the facility for crude oil: " '[P]etroleum product' does not apply to crude oil because the very definition of crude oil is that it is oil to be refined. Petroleum product must necessarily exclude crude oil, which is not a 'product' at all."

We find that the district court's ruling in this respect was erroneous. It appears as though the district court was citing to the following portion of the permit:

> Project Description: Construct a pier addition; install dolphins and buoys in accordance with the plans and drawings attached hereto which are incorporated in and made a part of this permit (petroleum product loading/unloading facility).

For one thing, it is not clear whether the parenthetical phrase at the end of the "Project Description" was intended to be, or actually is, a substantive, legal limitation on the use of the new platform. Additionally, the fact that the relevant language of the permit states "loading/*unloading* facility" provides some evidence that the permit envisioned the use of the new platform for offloading crude. While it certainly is possible that tankers could offload refined product at the refinery, the evidence suggests that crude oil is traditionally offloaded from, while refined product is traditionally loaded onto, tankers.

Moreover, in the Corps' Permit Evaluation and Decision Document, the "Need and Purpose" of the project is set forth as follows: "To expand a petroleum product loading/ unloading facility." This indicates the Corps' understanding that the old platform (which undisputedly allows for crude offloading) was part of a "petroleum product loading/ unloading facility"; apparently no further linguistic qualification was necessary to establish the fact that the old platform could be (and was) used for crude oil. This use of the terminology indicates that the Corps was not drawing a clear line between a platform that can handle crude oil offloading and

a "petroleum product loading/unloading facility." A more reasonable interpretation is that the Corps understood the entire dock and its platforms to qualify, generally, as a petroleum product loading/unloading facility. Therefore, it is not at all clear that the terms of the permit limit BP's use of the new platform.

If the new platform in fact is physically incapable of handling crude oil, the relevant question is: What would be required to enable it to handle crude oil? In this respect, the history of the dock is significant. BP was granted a permit in 1969 to build essentially what it now has—a two-platform dock with one platform devoted to unloading crude and another devoted to shipping refined product. When the construction took place two years later, BP decided to build only one of the two platforms and to defer construction of the second platform. In its environmental report, BP indicates that hardware modifications were necessary to convert the single platform into a dual-use platform: "Crude and product pipelines were redesigned to allow for dual utilization of the southern platform." If BP is now free to make modifications (to the extent they are required) to the new platform to allow it to handle crude, then the Corps' permit, in effect, may have increased the ability of the facility to handle crude oil.[5]

Based on the above discussion, we remand this case to the district court to answer the following questions:

1. Is it *physically possible* for the new platform to handle crude oil today?

2. Is it *physically possible* to modify the new platform such that it could handle crude oil, without requiring additional permitting?

---

[5]The Corps argues that "there is no danger that the new dock will suddenly be modified to accommodate crude oil because Corps permits must be strictly complied with." However, as outlined above, we do not find that the permit limits use in the way that the Corps contends.

If the answer to either of these questions is "yes," then the permit violates the Magnuson Amendment. As to the first question, clearly, if it is physically possible for the new platform to handle crude oil today, the terminal's capacity to handle crude oil has been increased. As to the second question, if the modifications that may be necessary to allow the new platform to handle crude oil do not require additional permitting, then the permit that allowed the new platform's construction *effectively* permitted an increase in the terminal's ability to handle crude oil. The Magnuson Amendment's use of "will or *may*" mandates this result, *see* 33 U.S.C. § 476(b) (emphasis added); this puts a very heavy burden on BP and the Corps, as they must prove that the new platform cannot possibly be used to handle crude oil without the issuance of an additional permit.

### iii.    *"Volume of Crude Oil Capable of Being Handled": Berthing Limitations*

A related issue is the way in which the modifications to the terminal may have altered the terminal's berthing capacities, which must be taken into account when determining whether the permit increased the volume of crude oil capable of being handled at the terminal. The Corps and BP conceded at oral argument that, in enacting the Magnuson Amendment, Congress could not have meant to restrict "the volume of crude oil capable of being handled" to the sheer theoretical hydraulic or pumping capacity of BP's terminal facility. The Corps admitted that a determination of the terminal's capacity as of October 18, 1977, which the Magnuson Amendment uses as a benchmark, would properly include berthing capacity as a limiting factor. BP also pointed out that although the terminal had the theoretical hydraulic or pumping capacity to unload more than one million barrels of crude oil per day, the facility could move only one boat in to dock and one boat out of the facility each hour, substantially limiting its actual unloading capability. In determining whether the permit violated the Magnuson Amendment, then, the district court should also

consider how the modifications to the terminal affected berthing capacity.

If the alterations to the terminal authorized by the permit increased the potential berthing capacity for purposes of unloading crude oil, then the permit violated the Magnuson Amendment. In other words, if the permit increased berthing capacity such that more ships carrying crude oil can arrive and leave the terminal in a given day, then, *ceteris paribus*, the permit increased the volume of crude oil capable of being handled at the facility. Therefore, we remand to the district court to answer the following question:

1.  Did the modifications authorized by the permit increase the potential berthing capacity of the terminal for tankers carrying crude oil?

If the answer to this question is "yes," then the permit violates the Magnuson Amendment. We recognize that the answer to this question may well be bound up with the answers to the previous questions that we have directed to the district court.

[23] We decline to speculate as to whether BP's stipulated restriction on its use of the terminal may be an adequate remedy, should a violation of the Magnuson Amendment be found by the district court on remand. If a violation is found, the district court should determine whether the stipulation is an adequate remedy, and, if not, what further remedial measures are necessary.

## CONCLUSION

[24] For the foregoing reasons, we AFFIRM the district court's denial of BP's motion for summary judgment on the grounds that OA lacked standing and that laches bars this action. We REVERSE the district court's denial of OA's summary judgment motion on NEPA and Magnuson Amendment grounds. We REMAND this case to the district court with

instructions to remand to the Corps so that it can (1) prepare a full EIS considering the impact of reasonably foreseeable increases in tanker traffic, and (2) reevaluate the dock extension's potential violation of the Magnuson Amendment. The district court should direct the Corps to revoke the permit or place conditions on the operation of the dock extension if necessary to ensure compliance with the law. 33 C.F.R. § 325.4(a); *see also* 33 C.F.R. § 325.6(b). We also REMAND this case to the district court to consider OA's request for injunctive relief. On remand on this question, the district court should conduct an evidentiary hearing to consider whether the pier extension would increase vessel traffic beyond the increase produced by market forces and what harms BP may suffer under an injunction.

The opinion of the district court is

**REVERSED** in part, **AFFIRMED** in part, and **REMANDED.**